Veterans Appeal and Employee Appeal. The latter is being submitted on the briefs and will not be argued. We've had a little change in the order of argument. It means that the first case is Smith & Nephew v. Synthes-Stratec, 07-1048-1060. Mr. Poissant, please proceed. Good morning, Your Honors. May it please the Court, my name is Brian Poissant from Jones Day, appearing on behalf of the defendant's appellants, the Synthes defendants' appellants. I would first like to address the issue of inducement. In this case, the 406, the asserted 406 patent is a surgical method patent. It's a method for treating intertrochanteric fractures. It also requires the specific step of active compression. Synthes does not perform surgery. Synthes is not a direct infringer. And the only way Synthes can be found liable is pursuant to 271B, inducing infringement, by inducing surgeons to use the claim method of treating intertrochanteric fractures with active compression. Now, the district court opinion, which appears in the appendix at A00109-111, that part of the opinion, the district court simply found that if a surgeon practices the method of active compression, the TFN, uses the TFN with interfragmentary compression to treat an intertrochanteric fracture, there will be direct infringement. The court never found that anybody actually directly infringed. Well, let me ask you about the 917 patent, the entitlement to that filing date for the two subsequent patents. And the question is whether the two subsequent patents, which claim inventions involving one pair of screws, are entitled to the benefit of the filing date of the 917 patent, which talks about two pairs of, not screws, holes. Two pairs of holes. Holes. Holes, yeah. Big difference. Could you address that, please? Okay, certainly, Your Honor. The district court, in that case, in that instance, on that issue, found that the 917 grandparent application that was filed on December 30th of 1986, disclosed two headed holes, and therefore it necessarily disclosed one headed, one pair of holes in the head, because, according to the court, the second pair of holes was not disclosed as being integral to the function or structure of the invention. That was dead wrong for several reasons. Dead wrong means clearly erroneous? I'll take it clearly erroneous. In that instance, Your Honor, first and foremost, Your Honor, if you look at the entire disclosure of the 917 application, each and every time they talk about the number of holes in the head, they use the phrase, at least two holes. This is in the summary of the invention. It's in the detailed description of the invention. It's in all the relevant drawings that show two holes, at least two holes. It's in the abstract. I submit, Your Honor, that the district court's conclusion that two holes was not integral is directly contradicted by the phrase, at least. If an applicant consistently and all the time- But the court said the second pair was not integral to the invention, they were important for an optional anchoring means? Yes. Well, if there's an optional- Doesn't that imply an invention of one pair of holes? No, absolutely not, Your Honor. And the reason why- Clearly erroneous. I'm sorry? Clearly erroneous. Clearly erroneous. In this instance, Your Honor, again, it's the phrase, at least two. It consistently says the head has to have at least two holes. This was not an accident. You're saying that that is so clear that any ambiguities in other language are overcome by that? I submit that in itself, but there is other language. For example, it wasn't inadvertent, it wasn't accidental, and it wasn't just an aside, because when they talk about the holes at the other end of the device, at the stem holes, they say, at least one. And then they talk about how the second hole is optional. So they're perfectly capable of saying at least one when they want to, and the second hole being optional. That's not what they said in regard to the head holes. That would certainly be true if this were claim language. I mean, I think you'd have a very powerful argument. But this is- we're talking about what was disclosed. And therefore, I would assume that in many settings, if you say that something has- say you have a patent on a car of some sort, and you say, well, it has two sets of headlights. It has one set of headlights, which is used normally, and in addition, it has fog lights. Well, if you claim those two sets, then something that only has one set of headlights wouldn't be covered. But if- it's not clear to me that you haven't disclosed something that has only ordinary headlights and lacks the fog lights. Why? I think that's the mistake that the judge made, Your Honor, is that he felt that the normal disclosure of two would include one. And therefore, if I have two holes, I must have one holes. But that's not what it says. It doesn't say two. That would probably be true if the disclosure simply said two holes. It says at least two holes. And there was a reason for that, because as we point out in our briefs, the stated- one of the stated objectives of this device was to be a universal device. It was supposed to be able to treat all the different types of femoral fractures that were disclosed within the four corners of that application. Two of those femoral fractures, femoral neck fractures and unstable intertrochanteric fractures, had to have the second anchoring means going through the second hole. That was indicated. There were other fractures. It is true. There were other fractures which did not require the second screw or the second anchoring means. But if you were going to have a universal device that was capable of treating all the fractures, you had to have a device that had the two holes. What would happen if a doctor's doing a surgery, he gets in there and says, Hey, this is an unstable intertrochanteric fracture. I need the second anchoring means. He's not going to drill a hole in the spot. That's why it had to have two holes. That's what they talked about. That was the whole objective of this particular invention was to have a universal device, a device that could be available to treat all these different types of fractures. Now, granted, you didn't need two screws to treat all the fractures, but you certainly needed the two holes being available. If we agree with you on the two-hole, one-hole set of holes issue, do all the other issues go away? I think you've had seven issues. Yeah, there's a lot of issues in this case, Your Honor. Well, claim, it would certainly do away with claim one, all the claims that only require one hole. I think it would get rid of virtually all the issues, frankly, because the claims, we don't have two holes, so the claims that require two holes are not infringed. It's only the claims that only require one hole, and if they're not supported, they've already admitted it's undisputed that the claims are invalid in view of a 1987 prior use and sale. If they're not entitled to the earlier filing date, so that probably would be disqualified. So, best mode, injunction, diligence, all that goes on the boards. I believe it would, Your Honor. Interpretation of screw? Interpretation of screw. You were... I have a question with respect to the second hole. Under the description of 663, at least, that second hole was specific so that there would be no rotation. Is that correct? The second hole is used, Your Honor, for an anchoring means. The anchoring means prevents rotation when you're dealing with specific fractures. The fractures you're dealing with are the femoral neck fractures and the unstable inner trochanteric fractures. For those type of fractures, which are in the upper part of the femur, you should, it's indicated, it's taught in the patent, that you use the second anchoring means, which is usually a second screw. To prevent the... For other fractures, subtrochanteric fractures, for example, which are further down the femur, you don't need the second screw. That's not indicated. Because there's no potential rotation. There's no potential rotation. Now, that second hole also could take a nail or a screw or otherwise, right? That's true. An anchoring means is defined as a nail, a screw, or a bolt. That's Claim 2. Claim 3 specifies that it's a screw. But under Claim 1, all you need is one screw. Claim 1 only requires one hole and one screw. One screw. Now, does that mean that because of the disclosure that you're talking about of at least two holes, it would eliminate any possibilities of infringing Claim 1? If at least... Claim 1 would be anticipated by the... Well, Claim 1 would be anticipated. Since Claim 1 only requires one hole, it covers two holes. So, therefore, a 1987 prior use of something with two holes will anticipate. But the issue here, of course, is whether the one hole, when they broaden the disclosure in the CIP to go from at least two to at least one, with the second hole being optional, that's the problem. Well, I don't quite understand the language of at least one. I'm sorry? At least one. I mean, you have a hole or you don't have a hole, right? Well, they specify, basically, in the CIP that the only one hole was required and the second hole was optional. In the earlier case, in the great-grandparent case they were talking about, they specified at least two holes. Now, for example, another thing. The judge got into this concept of a species-genus situation. And he cited this case, Bilstein v. Guadalupe, I believe, for the proposition that one species can support a genus. And he went off and he concluded that the disclosure of two, which was that species, would support a genus which included one. I don't think there's any precedent in the history of this court or the predecessor CIP that would remotely conclude that the disclosure of at least two would support a genus that includes one. In other words, his proposition makes sense, but not for this case. I'm sorry? In other words, his statement of law may be correct, but it's irrelevant to this case. That's your argument. That's it. Yes. That's your argument. The answer is yes. No, I think the way the judge applied it was wrong in this case. Right. That's what Judge Lurie was saying. Exactly. Dead wrong. I'm sorry? Dead wrong. Dead wrong. You started with the 406 patent, I think. Is there a material change in the remedy if one of the two patents falls away, the 406 falls away? You say there's just not sufficient evidence of actual infringement to support a judgment on that patent. The 663, of course, would not be effective. Under the 663 patent, there were, I think, nine products were accused of infringement. Seven were found out to infringe. Two were found infringing. They've since been changed. All of the products, to the extent they were used for treating intertropontary fractures, were enjoined by the court, irrespective of the structure. And that's what implicates the 406 method patent, and that's why I, frankly, was leading with inducement, because that gets rid of a lot of things, too. Right. But that—I'm having trouble trying to sort out the relationship between your objection to the scope of the injunction and the effect of getting rid of, if we were to reverse, for example, on the 406, and how that affects, practically speaking, where we end up. It sounds like you're saying that because of the breadth of the injunction, the 406, there is a different effect, but then you object to the injunction. Well, the injunction itself has some objectionable language in it, but that is apart from the underlying substantive issue of whether inducement and induced infringement— I understand that, but let me put it this way. You wouldn't be thrilled to walk away from here, I take it, with nothing other than winning on the 406. Well— You wouldn't consider that a great day for your client. No, I think it would, Your Honor, because it would be the correct— You don't think it's the correct result with respect to the 663. Well, the 663 has got different issues. Well, I understand, but what I'm saying is if you lose on the 663 and win on the 406, does it get you anywhere? Absolutely. And that's why, frankly, that's why I was talking about inducement and infringement of the 406 patent, because the court below, as you can readily see from the memorandum opinion, there were absolutely no findings. Why? Because there was no evidence to support any instance of direct infringement by a surgeon. There was no evidence to show synthies ever knew of the patent before the action was commenced. And most importantly, there was absolutely no evidence showing that synthies engaged in intentional culpable conduct to actively encourage doctors to use active compression— Mr. Poisson, you're well into your rebuttal time. You can continue and use it, or you can save it. No, I just noticed how much I've got left. I'd better stop. Mr. Hu. May I please support? I'm representing the athlete cross-palleteer, Smith and Nephew. We obviously believe that the district court's findings are not clearly erroneous on the issue that the court asked Mr. Poisson to address with respect to whether the disclosures in the original 917 application support a one-hole device as well as a two-hole device. This is an area in which if the court reviews the district court's opinion, it is obvious that the district court was very much aware of the standards that are applied about a written description and its adequacy, was aware that the clear and convincing evidentiary burden was placed upon the defendant, and concluded that they did not— But the court's reasoning wasn't very sound. To cite the proposition that a disclosure of a species supports a claim to a genus may be true, but here the issue is whether a disclosure of one species constitutes a disclosure of another one. Well, I think he addressed that, Your Honor. I mean, he did talk about the genus-species line of cases, but that's not all he said. He pointed very specifically to the portions of the specification, the testimony of witnesses about what one would understand this disclosure to support, and the inherency of the one-hole in this particular two-hole device. And he particularly noted the issue of, is the presence of the second hole integral to the fundamental concept of this invention? And here's where the evidentiary record supports his conclusion and differs from the argument Mr. Poisson would make from it. And that specifically, Mr. Poisson always uses the term, this is supposed to be a universal device. The 1917 language focuses on the ability to treat a variety of fractures and says the object of the invention is marrying the benefits of an intermediary rod with the proven benefits of the compression hip screw systems, which allowed the so-called sliding compression where under passive load bearing, the fractured surfaces could oppose under that weight bearing. Those were all like the object I'm showing. It was trial exhibit, let's see, 60, I believe, or no, excuse me, 30 or 31, a compression hip screw. This kind of one-screw device was directly what he sought to marry with an intermediary rod. And in the opening abstract and other places pointed to in the specification, he notes that a screw accomplishes that objective. There was testimony that in fact this unique need to have two screws for rotational stability. The question is what the 1917 patent discloses. That's correct, Your Honor. The 1917 patent discloses that if you want a more universal device that is capable of treating a neck fracture and controlling rotation, then you might want the ability to take advantage of an option of having a second screw, which necessarily means a second pair of holes through the rod through which that screw could be inserted. A second pair of holes or a second hole? Well, the way the claims are phrased and the patent is phrased, to talk about a pair of holes, describing as holes the openings on the opposite side of the rod through which each screw passes. So in the language of the 917, you have a pair of holes because of the two penetrations through the rod where a single screw goes. A second pair of holes is required for a second screw's penetration through the head of the rod. And all of the other fracture conditions that are also addressed in the specification, the witness testimony, which the court relies upon in these fact findings, said one could treat a great variety of fractures, and it was known in the orthopedic community and would have been known to one skilled in the art looking at what is disclosed in the 917, that you could have a device that would treat a variety of fractures and since you would not be concerned about a neck fracture needing rotational control, you would not need to ever use a second screw and therefore would not need a second pair of holes in the head because you weren't going to use that. And so the concept of a variety of fractures that could be treated by marrying an intermediary rod with the benefits of the compression hip screw, which was a device like this, a single screw device, is in that disclosure. The testimony supported that it inherently disclosed to a person of ordinary skill in the art the ability to make a device that would treat a variety of fractures and only have one screw because you were not interested in marketing it for the additional optional use that would require a second pair of screw holes. And that testimony was there. The amendments were originally presented in the 217 for claims directed to a one-hole device. They were on the eve of issuance of the original allowed claims. The examiner suggested filing it as a continuation instead, and a CIP followed. But the notion that the inventor was possessed at the time and had a disclosure that one of ordinary skill in the art would perceive to include a device that was capable of treating a wide variety of fractures, neck fracture being virtually the only one it would treat, without needing an optional second screw and therefore without needing a second pair of holes through the head, was in fact inherently present and was in fact disclosed in the disclosures which talk about a device that has at least a screw and an intermediary rod. And it appears both in the abstract and places in the spec, while admittedly there's also the reference to at least two pairs. The reference to, of course, that's the beginning of the statement of what the head includes, at least two pairs of holes. But in other places it refers back to the screw. And the abstract, which even perceives that, says a screw. So there were conflicting points in the specification. You had a trial judge who did what I think he was supposed to do. He listened to all the testimony of witnesses about what one of ordinary skill in the art would have understood this disclosure to disclose. Of course, this is plain English. At least a pair of holes doesn't really require specialized testimony to understand. Well, when you also talk about a hole and you talk about options and you're trying to say how does one of ordinary skill in the art put that together to understand what the inventor was possessed of, I think the testimony was appropriate. It was their burden by clear and convincing evidence. We think the judge's factual findings are not clearly erroneous, and under the circumstances he should be affirmed on those issues. Can I ask you about the 406 patent and the sufficiency of the evidence of infringement? Certainly. What do you have, or what was introduced, that demonstrates there was in fact actual infringement? One must keep in mind that this was a bifurcated liability and damages hearing, so we didn't put in lots of evidence about multiple surgeries where this was being performed. You didn't put in any evidence with respect to the actual commission of all the elements of the 406 method? Other than hypothetical, that it would be done this way or it could be done this way. Is there any evidence of anybody that said this was done? Dr. Turin, their own witness, testified that he had used the device to treat endotropic fractures and he followed the procedures that they tell the surgical community to use. If you look at a Rockster type precedent, that testimony by Dr. Turin is found You understand what I'm trying to get at. I'm trying to see if you've got some nice hard evidence that there actually was an infringing use of the method. He testified both on direct to being a user, and I don't have that side as handy. He talked about how in inserting it, he had problems or concerns about distracting the fracture. That's at A5743 and following. And they sent these witnesses, Mr. Hall, I described. We put in evidence of the total sales of the product. Mr. Hall testified this device was intended to fill a hole in our product line because we didn't have an intermediary rod or intertrochanteric fractures. We put in evidence that most of the fractures that are going to be treated with this kind of device are going to be intertrochanteric fractures. There was no actual finding of inducement by the lower court. I agree that the court in its original liability finding did not make a specific finding in that regard. And I think he didn't because given the fact that this is a very specialized kind of product where you don't just put it out on the market. You make specialized tools, all that box of things we've had shipped up here that is exactly how the surgeon has to put it in. You put out a detailed step-by-step that follows with each of the steps included in the method of this patent instructions to doctors how you insert their device. But once again, there was no finding of inducement. He did not make that specific finding. It's obvious from the court's injunction and what he said when Synthes asked him to modify it. And he said, wait a minute, you have taught the medical community to use this device to treat intertrochanteric fractures. And you have told them that when they need to use active compression, something that you use if the fracture fragments are widely separated and you're trying to pull them together during an operation, or if you as a surgeon, once you're in there, do something that moves the fracture pieces apart, you want a means to pull them close together. But the injunction was for perspective relief, wasn't it? It was clearly for perspective relief but was founded upon what is obviously his conclusion as reflected in those statements and supported by abundant evidence in the record that Synthes was out teaching the surgical community exactly the steps in the method. This isn't one of these things where there's a word here and a word there and maybe somebody would put this together in an infringing manner. Every step is set forth in the technical guide. Now, you pointed out that the trial was bifurcated. Yes. The issue of liability damages has not been determined yet. That's correct. So does that mean that the inducement factor is still to be determined for damages as to whether or not damages would be available for inducement in the second phase? I'm sure that at a damages phase, based on- Let me finish. Without a finding of inducement? I regard the judge's statement in the decision when he modified or dealt with the request to modify the injunction to be a finding of inducement. When he says Synthes taught the medical community to use this in a certain manner. He hadn't said it before. He said it then. And the record is totally supportive of a finding of active inducement under the Rochster standards and under any standards this court has ever issued. I mean, this is a medical device in which every step of the use is taught. It was designed primarily for intertrochanteric fractures, and they have sold hundreds of millions of dollars worth of it. But as I read the injunction language, does for prospective relief to enjoin any future aspects without any finding of past inducement? Well, I simply don't read it that way. I think the judge had to have found some activity in the past in order to think that there was anything wrongful to enjoin. And when he said Synthes has taught the medical community this method, he was making the finding on the ultimate issue of inducement. That is how they induce the surgeons to go out, have their sales reps show them the procedures, give them these technique guides, make the specialty tooling, and then sell multi-million dollars worth of a product intended primarily for intertrochanteric fractures, and which has as a critical feature the ability some way, if something happens or if you need it once you're in there working on a patient, to have active compression. They have a special device that supplies it. We may argue at damages whether our damages are limited to those operations in which they actually use that or whether the sales require it. When you're getting a question from the judge. I'm sorry. Just to listen. I want to make sure that I understand where you are on what was the requirement of proof to support the injunction. Do you believe that you had an obligation to show that there was some actual inducement of actual infringement before the judge could enter an injunction, or is it sufficient simply to show that there was a risk of induced infringement? I believe that we endeavored to show and did show actual inducement. Okay. But I'm asking you whether, assuming I don't agree with you, that you actually showed that there was even a single case in which this method had been practiced, does that defeat the claim for an injunction? I don't think it necessarily does, Your Honor. I can't cite any case that I've seen exactly like that. Typically, injunctions are predicated on violations. I just wonder if you are arguing that this is not a case in which that is required. We have not made that argument. All right. And you say if we look at Turin's testimony and Hall's testimony, we will find actual evidence reciting that this has been practiced. And if you look at the sales numbers exhibit and you couple that with the testimony that this is primarily a device for intertrochanteric fractures, a reasonable inference is this device has been used by one or more surgeons prior to this trial to treat an intertrochanteric fracture, and given the distracting nature of the device that Dr. Turin described, the availability and use of the buttress compression net would have been part of one or more surgeries that involved this device. You would ask to save a little time to respond on your cross appeal. Yes, Your Honor. Would you like to do that? It's going to be very little. The cross appeal... Well, if you use it now, it will be gone. Right. Let me go ahead and do it rather than try to reserve. I've only got 30 seconds left at this point, Your Honor. Fine. I think on the cross appeal, it's a significant set of issues because it would result in all of the devices being covered by the apparatus patent, and it would not involve the methods patent issues at all. We believe and have set out in the brief that the court erred in attaching too much significance and not putting in context the notion of thicker wall to strengthen the head, something that could be accomplished wherever the thicker walls are found, and it's undisputed it has thicker walls. Generally uniform, introduced to overcome merino, and it's clear that it's talking about the length of it in a stem that otherwise had thinner walls in the head. If you accept our head wall view, then all the walls are thinner. It's uniform along the length, even though it may have scallops, a preferred embodiment, and there was nothing in that amendment that should have been construed to read out a preferred embodiment where some of the cross section will have irregularity, but it maintains lengthwise a control over the outer diameter, and it stays thinner. I think that uses up my time, Your Honor. Thank you, Ms. Cahoon. Mr. Poisson. On the issue of inducement, Your Honor, you asked Ms. Cahoon about evidence in the record. I submit our brief, our opening brief, was an invitation for them to marshal whatever evidence there was in the record to support either evidence of direct infringement that you inquired about or evidence of inducing infringement. It is simply not there. If you look at pages, I believe it's 14 through 17 of their brief, and I have them listed here. They cite, I think, six situations. They cite the stipulated facts in the joint pretrial order. If you look at them, they're totally irrelevant to any issue of inducement. They cite, too, numerous findings by the district court. If you look at the findings, they're absolutely irrelevant to anything having to do with inducement. They talk about, quote, designing the TFN to infringe, unquote. The TFN is clearly evident from the record. It has many, many, many uses other than treating intertrochanteric fractures. It treats lots of different fractures, and it clearly was not specifically designed to necessarily use... It's not designed to use the 406 method. There's many other uses for it. There's many other non-infringing uses. The fourth thing, it was, quote, registered the TFN as indicating for intertrochanteric uses. As I've just indicated, it has many other uses. Pertrochanteric fractures, subtrochanteric fractures, basal neck fractures, they're all in the evidence in the record as the indications for the TFN. It is not limited to intertrochanteric, and it certainly is not limited to active compression. What about Dr. Turin? Dr. Turin, good point. Dr. Turin, if you look closely at the evidence, I believe the evidence, the Turin testimony that you're referring to appears in their brief also. I think it's in the opening part of their brief. And if you look closely at it, what Dr. Turin is testifying to is if, in fact, distraction occurs during surgery. Dr. Turin was a surgeon. He says if distraction occurs during surgery using the TFN, active compression is available if the doctor wants to use it to pull it back. He never testified about anybody actually using it. That's what that testimony shows. They also made the argument about the technique guide. That's a good point. There's two items of evidence in the record. Normally, inducements proved by promo literature, instructional. There's two things in the record. I think you should finish your thought because your time has expired. Oh, sorry. The point here, Your Honor, is they also, the two items of evidence in the record, the brochure, the TFN brochure, the TFN technique guide, have it. They just disclosed the various uses of the TFN for treating various types of fractures. The technique guide on page 26 has one paragraph that talks about active compression. One sentence, it tells you how to use active compression by turning the buttress compression nut. It doesn't teach you when it should be used, and it certainly doesn't teach any doctors to use it with active compression. The evidence is just not there. Thank you, Mr. Poisson. Ms. Cahoon, case should be taken under review.